**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF WEST VIRGINIA**

**BLUEFIELD DIVISION**

PENNY PRUDICH,

      Plaintiff,

v.                                      CIVIL ACTION NO. 1:20-cv-00019

ANDREW SAUL,
Commissioner of Social Security,

      Defendant.

## PROPOSED FINDINGS & RECOMMENDATION

Plaintiff Penny Prudich ("Claimant") seeks review of the final decision of the Commissioner of Social Security (the "Commissioner") denying her application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act, 42 U.S.C. §§ 401–33. (ECF No. 1.) By standing order entered on January 4, 2016, and filed in this case on January 10, 2020, this matter was referred to the undersigned United States Magistrate Judge to consider the pleadings and evidence and to submit proposed findings of fact and recommendations for disposition pursuant to 28 U.S.C. § 636(b)(1)(B). (ECF No. 3.) Presently pending before this Court are Plaintiff's Brief in Support of Complaint and Motion for Judgment on the Pleadings (ECF No. 8) and the Commissioner's Brief in Support of Defendant's Decision (ECF No. 11).

Having fully considered the record and the arguments of the parties, the undersigned respectfully **RECOMMENDS** that the presiding District Judge **DENY** Claimant's request to reverse the Commissioner's decision (ECF No. 8), **GRANT** the

Commissioner's request to affirm his decision (ECF No. 11), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this action from the Court's docket.

## I.    BACKGROUND

### A. Information about Claimant and Procedural History of Claim

Claimant was 53 years old at the time of her alleged disability onset date and 56 years old on the date of the decision by the Administrative Law Judge ("ALJ"). (*See* Tr. at 201.)[1] She completed one year of college and finished cosmetology school. (*Id.* at 205.) Most recently, she was employed as a teacher's aide in a public school system, and she has also worked as a hairdresser. (*Id.*) Claimant alleges that she became disabled on November 23, 2015, due to stenosis, history of two back surgeries, low back arthritis, depression, migraine headaches, and hand and wrist pain. (*Id.* at 201, 204.)

Claimant protectively filed her application for benefits on November 9, 2016. (*Id.* at 185–92.) Her claim was initially denied on December 28, 2016, and again upon reconsideration on March 1, 2017. (*Id.* at 102–06, 108–10.) Thereafter, on March 5, 2017, Claimant filed a written request for hearing. (*Id.* at 111–12.) An administrative hearing was held before an ALJ on November 14, 2018, in Bluefield, West Virginia, with the ALJ appearing from Tampa, Florida. (*Id.* at 30–78.) On November 26, 2018, the ALJ rendered an unfavorable decision. (*Id.* at 7–24.) Claimant then sought review of the ALJ's decision by the Appeals Council on December 20, 2018. (*Id.* at 182–84.) The Appeals Council denied Claimant's request for review on November 13, 2019, and the ALJ's decision became the final decision of the Commissioner on that date. (*Id.* at 1–6.)

Claimant timely brought the present action on January 9, 2020, seeking judicial review of the ALJ's decision pursuant to 42 U.S.C. § 405(g). (ECF No. 1.) The

---

[1] All references to "Tr." refer to the Transcript of Proceedings filed in this action at ECF No. 7.

Commissioner filed an Answer (ECF No. 6) and a transcript of the administrative proceedings (ECF No. 7). Claimant subsequently filed her Brief in Support of Complaint and Motion for Judgment on the Pleadings (ECF No. 8), and in response, the Commissioner filed his Brief in Support of Defendant's Decision (ECF No. 11). As such, this matter is fully briefed and ready for resolution.

### B. Relevant Medical Evidence

The undersigned has considered all evidence of record, including the medical evidence, pertaining to Claimant's arguments and summarizes it here for the convenience of the United States District Judge.

#### 1. Medical Treatment During Relevant Period

Shortly after her alleged onset date, on December 1, 2015, Claimant presented to her pain specialist for a follow-up appointment and continued to complain of pain in her lower back and lower extremities. (Tr. at 443.) She stated that her previous treatment had provided relief "for about 2 weeks" but "the pain came back." (*Id.*) She rated her pain "a 7 on a scale of 1–10." (*Id.*) She reported that "[s]tanding and walking makes her pain worse" and "[l]ying down makes [it] better." (*Id.*) Upon physical examination, the pain specialist noted normal, but painful, range of motion in Claimant's lumbar spine and observed that she "[m]oves extremities without difficulty" and had a normal gait. (*Id.* at 446.) He ordered an MRI of Claimant's lumbar spine and directed her to "continue to take time from work." (*Id.* at 447.) The MRI was conducted on December 22, 2015, and revealed "[s]evere spinal stenosis at L4-5 level from a combination of congenitally narrow spinal canal, discogenic disease and ligamentous hypertrophy"; "[s]table right hemi laminectomy defect at L5-S1 level"; and "[m]ild to moderate bilateral neural foraminal stenosis at L4-5 level from facet arthropathy and bulging annulus." (*Id.* at 320.)

In the meantime, on December 17, 2015, Claimant presented to her primary care physician, Dr. Nancy Lohuis, M.D. ("Dr. Lohuis"), complaining of "right elbow and arm pain." (*Id.* at 572.) Claimant also reported "dull" pain in her low back, thighs, and knees that worsened "with activity[,] particularly walking" and improved "with lying down" but not sitting. (*Id.*) She stated that she was able to care for her personal hygiene, including showering, and was able to do "a little housework," including changing sheets, doing dishes "for short [sic] period," and doing laundry "but can't go down the stairs to the washer." (*Id.*) Claimant told Dr. Lohuis that she had stopped getting massages but continued stretching and yoga in addition to using her pain medication. (*Id.*) Upon physical examination, Dr. Lohuis observed that Claimant walked with an antalgic gait that was "[b]etter if she moves around the exam room" and that she was "[a]ble to get up from [the] chair." (*Id.* at 573.) Dr. Lohuis also observed a decreased range of motion in Claimant's lumbar spine but "[n]o pain to palpation of the spine itself" and "[n]o SI joint pain on the left." (*Id.*) She noted that Claimant was able to stand on her toes and heels and on one foot, and a straight-leg-raising test was "negative bilaterally both sitting and standing." (*Id.*) Claimant was directed to "avoid pushing, pulling, bending and stooping" and to continue treatment with her pain specialist. (*Id.* at 574.) When Claimant returned to Dr. Lohuis on January 25, 2016, for her preventative health examination, Dr. Lohuis observed that she had "[n]ormal gait and balance" and "[n]o evidence of significant arthritis." (*Id.* at 566.) Claimant denied any back pain. (*Id.* at 565.)

On January 28, 2016, Claimant presented to a neurosurgeon for an evaluation of her low back and lower extremity pain upon a recommendation from her pain specialist. (*Id.* at 342.) She reported "extensive treatment" but worsening symptoms and expressed a desire to discuss "surgical options" for her "severe lumbar stenosis." (*Id.*) A physical

4

examination revealed "equal" movement in both lower extremities and "stable" strength but "decreased reflexes." (*Id.* at 344.) Because Claimant "has exhausted conservative treatment measures and has persistent pain in spite of this" that "has forced her to leave her job," the neurosurgeon recommended "an L4-5 lumbar laminectomy." (*Id.*) He ordered an x-ray "to confirm that there is no instability" (*id.*), and it reflected "[m]ild degenerative changes without acute fracture" (*id.* at 313). Claimant had the procedure on February 19, 2016. (*Id.* at 303–04.)

Claimant presented to her neurosurgeon for a follow-up appointment on March 3, 2016, and reported "she does feel like she is making a positive trend towards recovery." (*Id.* at 335.) She stated that she "still has some of her leg pain" and "has good days and bad days." (*Id.*) The neurosurgeon observed that Claimant "is neurologically stable" and instructed her to "continue with her exercises and advance her activity." (*Id.* at 336.) He recommended that Claimant be re-evaluated in four weeks and that she not return to work until that time. (*Id.*)

Claimant began physical therapy on March 16, 2016, with a "spine evaluation." (*Id.* at 366–67.) She described her pain as a "constant" and "sharp" "ache" and rated it "5/10" that day. (*Id.* at 366.) She reported that her symptoms were aggravated by bending, stairs, lying on her right side, walking, and standing and relieved by lying supine, ice, and pain medication. (*Id.*) She also reported that her activities of daily living required increased time to perform and that she was unable to lift and required assistance performing household chores. (*Id.*) She stated that she could sit and stand for twenty minutes at a time and walk for five to six minutes but that she had not tried to lift anything since her surgery. (*Id.*) The physical therapist observed that movement was painful for Claimant and that she ambulated independently with a mildly antalgic gait. (*Id.*) She

noted tenderness and swelling along Claimant's surgical incision but observed full muscle strength in her left lower extremity and slightly decreased strength in her right lower extremity.  (*Id.* at 367.)  It was recommended that Claimant attend physical therapy sessions twice weekly for six to seven weeks in addition to performing at-home exercises. (*Id.*)  The physical therapist rated Claimant's rehabilitation potential as "good."  (*Id.*)

On March 31, 2016, Claimant presented to Dr. Lohuis and reported that her leg pain was "50% improved" since her surgery, but "[s]he is still having pain in the right thigh and right medial calf pain," as well as "a lot of pain in[] the back."  (*Id.* at 560.)  She related that she "is having a hard time" in physical therapy and "is discouraged with her results."  (*Id.*)  Still, she reported that she "is able to do dishes," "a little laundry," and "a little housework" but "is not lifting anything more than 10 [pounds]." (*Id.*)  Upon physical examination, Dr. Lohuis observed that Claimant walked with an antalgic gait that was "[b]etter if she moves around the exam room" and that she was able to stand on her toes and heels and on one foot.  (*Id.* at 561.)  She noted decreased range of motion in Claimant's lumbar spine but "[n]o pain to palpation of the spine itself" and "[n]o SI joint pain on the left."  (*Id.*)  A straight-leg-raising test was "negative bilaterally both sitting and standing." (*Id.*)  Claimant was directed to "avoid pushing, pulling, bending and stooping" and to continue treatment with her pain specialist and her neurosurgeon.  (*Id.* at 562.)

At her next appointment with her neurosurgeon on April 5, 2016, Claimant reported "making some improvements with her leg pain" but experiencing "some persistent back pain."  (*Id.* at 333.)  The neurosurgeon prescribed a TENS unit and recommended that Claimant "continue with pain injections likely after she finishes up her physical therapy." (*Id.* at 334.)  He instructed Claimant to return "on an as-needed basis." (*Id.*)  About a month later, on May 5, 2016, Claimant presented to Dr. Lohuis and reported

that she was "[s]till getting better" but "not getting as much improvement as she did the last visit." (*Id.* at 554.) She stated that "she feels terrible today" and related that her "[r]ight leg still bothers her with pain in the right thigh with a deep pain that occurs with walking." (*Id.*) Her daily activities were largely unchanged from her previous visit, except she stated that "[s]he is attending some meetings for her husband who is running for Judge." (*Id.*) A physical examination revealed normal gait and station and "[n]o pain to palpation of the LS or the trochanter or SI joints." (*Id.* at 555.) Dr. Lohuis also observed, "There is normal power in all muscle groups of the right lower extremity at this time. This is a definite improvement from presurgical state." (*Id.*) She directed Claimant "to continue physical therapy, get lots of rest, never left [sic] greater than 10 pounds." (*Id.* at 556.) Claimant completed her physical therapy later that month, and upon discharge, her physical therapist noted that she met her short-term and long-term goals and could tolerate activity "for up to 40-60 min[utes]." (*Id.* at 356.) She attended twelve of her nineteen scheduled sessions. (*Id.*)

On May 24, 2016, Claimant received a facet joint injection from her pain specialist. (*Id.* at 448–49.) Two days later, she presented to Dr. Lohuis and requested a TENS unit. (*Id.* at 551.) She related that "she is now 60% improved" but "is having a hard time being patient" because "[s]he is anxious to get better." (*Id.*) Dr. Lohuis ordered the TENS unit and directed Claimant to continue her injections. (*Id.* at 553.) At her July 14, 2016 follow-up appointment with her pain specialist, Claimant reported that "[s]he received 75% relief . . . for 14-21 days," but "[t]he pain has since returned." (*Id.* at 450.) She stated that she was unable to "sit, stand, stoop, for any amount of time without significant pain" and rated her pain "on average 6-8 out of 10." (*Id.*) The pain specialist recommended another facet injection, which Claimant received on August 1, 2016. (*Id.* at 451–53.) In the

meantime, Claimant presented to Dr. Lohuis on July 21, 2016, and reported that "[t]he May injection did help," but "[s]he is still having pain in the back and still having pain in the leg." (*Id*. at 548.) She stated that the "[o]nly relief is when she lays down" and that the pain "is better in the [morning] and worsens as the day goes on." (*Id*.) She also related that she was "[a]ble to drive short distances" but "had some pain" during a recent trip. (*Id*.) Upon physical examination, Dr. Lohuis observed that Claimant walked with a normal gait and was able to stand on her toes and heels and on one foot. (*Id*. at 549.) She noted "minimal" pain "to palpation of the spine." (*Id*.) She instructed Claimant to follow up with her neurosurgeon for her continued right leg pain and to avoid heavy lifting. (*Id*. at 550.)

Claimant returned to her pain specialist on August 24, 2016, stating "that she did receive at least 70% relief with [the August 1] injection but still has pain when doing household chores and sitting for a period of time." (*Id*. at 454.) Claimant rated her pain "3-4 on a scale 1-10" but noted that "she feels that the injections are wearing off a little bit." (*Id*.) She requested a new back brace and a TENS unit, which her pain specialist prescribed. (*Id*. at 454–55.) He also recommended "repeating the facet injections in about 4 weeks' time." (*Id*. at 455.)

Claimant next returned to her neurosurgeon on September 13, 2016, "to discuss further diagnostic testing to see if there is anything that needs treated." (*Id*. at 330.) She reported that she "has had some improvement of her symptoms but still has some persistence of back pain and lower extremity pain" that "hinder[s] some of her functional activities." (*Id*.) Upon physical examination, the neurosurgeon observed that Claimant "does move all extremities" and "[h]er gait is steady" but noted that Claimant complained of lower extremity and back pain. (*Id*. at 331.) He ordered imaging of Claimant's lumbar

8

spine and directed her to return afterward.  (*Id.*)  A September 21, 2016 MRI of Claimant's lumbar spine revealed a "[n]ew laminectomy defect at L4-5 level and stable right hemilaminectomy defect at L5-S1 level," a "[s]mall broad based central and right paracentral disc bulge at L4-5 level mildly effacing the ventral thecal sac," and "[m]ulti-level neural foraminal stenosis."  (*Id.* at 321–22.)  An x-ray of Claimant's lumbar spine taken that same day reflected "[a]rthritic changes" including "[m]ild to moderate intervertebral disc space narrowing . . . at L4-5 and L5-S1 levels," "minimal anterolisthesis of L4 on L5 vertebral body," and "moderate facet arthropathy."  (*Id.* at 323.)

The following day, on September 22, 2016, Claimant presented to her pain specialist for a facet joint injection.  (*Id.* at 456–57.)  At an appointment with her neurosurgeon on October 13, 2016, Claimant reported that the injection "helped her some with her pain and she is improving slowly."  (*Id.* at 325.)  Upon physical examination, the neurosurgeon observed that Claimant "has a stable gait" and "[m]oves all extremities left equal right."  (*Id.* at 326.)  He recommended that she "continue with conservative management and considering injections for treatment of her pain" and that she "advance activity as tolerated."  (*Id.*)  He did not recommend surgical intervention and directed Claimant to return as needed.  (*Id.*)  On October 27, 2016, Claimant presented to Dr. Lohuis, reporting that "[t]ime has made her pain a little better" but "[s]he is still most bothered by the Right leg pain and is still feeling improvement with injections."  (*Id.* at 545.)  A physical examination revealed normal gait and station but "some pain over the lower lumbar spine were [sic] previous surgery was done and some muscle spasm bilaterally."  (*Id.* at 546.)  Dr. Lohuis observed that Claimant was "[a]ble to stand on toes and heels" and on one foot.  (*Id.*)  She recommended massage therapy and instructed Claimant to "[c]ontinue daily walking" and "[s]tretching exercises."  (*Id.* at 547.)

Claimant next returned to her pain specialist on November 7, 2016, reporting "60% relief from her pain for the last 44 days" and rating her pain "3-4 out of 10." (*Id.* at 458.) She stated that she "[s]till has issues with right leg pain" and "[c]an walk about 15 minutes at work before she has to sit." (*Id.*) Claimant was scheduled to receive facet injections every three months. (*Id.* at 459.)

At her next appointment with Dr. Lohuis on February 9, 2017, Claimant reported that she "is still having a lot of back and leg pain." (*Id.* at 534.) However, she stated that she "is still feeling improvement with injections" and that her pain specialist "is still planning on injections every 10 weeks." (*Id.* at 535.) She also mentioned that "[t]hey are planning to do the Spinal cord stimulator." (*Id.*) Upon physical examination, Dr. Lohuis observed that Claimant's gait and station were normal without the use of a cane or walker and that she was "[a]ble to stand on toes and heels and on one foot." (*Id.* at 540.) A straight-leg-raising test was "normal bilaterally." (*Id.* at 541.) Dr. Lohuis directed Claimant to continue her current medications and exercise but not to "lift[,] stoop[,] or bend with [more] than 20lb." (*Id.* at 542.) She also recommended that Claimant "[p]roceed with spinal cord stimulator." (*Id.*) When Claimant returned to Dr. Lohuis on March 23, 2017, she stated that she had recently been to Florida "and used the Wheelchair and did well." (*Id.* at 525.) She stated that she had purchased a recumbent bicycle and an elliptical machine to use at home and "she can feel that it is doing something to her muscles." (*Id.*) Dr. Lohuis observed upon physical examination that Claimant walked with an antalgic gait. (*Id.* at 531.) She instructed Claimant to continue using the recumbent bicycle. (*Id.* at 533.)

Several days later, on March 29, 2017, Claimant presented to her pain specialist and requested "more injections in her back" because "the pain started returning about 4-

5 days ago." (*Id.* at 460.) That day, she rated her pain "7-8 on a scale of 1-10." (*Id.*) She also reported that "[s]he has been riding a recumbant [sic] bike and . . . is up to 11 minutes and she started at 3." (*Id.*) Upon physical examination, Claimant was positive for facet loading, but she had no muscle spasms or subluxations, there was "no overt evidence for instability," and she had full strength in her lower extremities. (*Id.* at 461.) The pain specialist recommended that Claimant receive another lumbar facet injection. (*Id.*)

Claimant returned to Dr. Lohuis on April 27, 2017, and reported that "[s]he had a Facet injection on April 4, 2017 just before a 2 [week] vacation in [Florida] and had a really nice time but a lot of pain in the legs [on the] plane on the way home." (*Id.* at 516.) She stated that her "Pain is worst in the legs now" but she was "Generally feeling better." (*Id.*) Claimant related that she had been caring for "the baby" on Mondays and Fridays and "[t]his has gone well." (*Id.*) She rated her pain "7/10" before medication and "2/10" after. (*Id.*) Upon physical examination, Dr. Lohuis observed that Claimant's gait and station were normal and she was "[a]ble to get up on toes and heels" and stand on one foot. (*Id.* at 522.) She noted "[n]o pain to palpation of spine" or "around the SI joints." (*Id.*) Dr. Lohuis remarked that Claimant "is doing well and seems more stable now." (*Id.* at 523.) She encouraged Claimant to do "[a]s much as she can without overduing [sic]" but "[n]o lifting or pushing more than 20lb." (*Id.*) At her next appointment on May 25, 2017, however, Claimant reported that "[s]he is not doing as well as last time." (*Id.* at 507.) She stated that she had increased her dosage of pain medication because it "helps her pain a lot more." (*Id.*) She reported that "she has aching in her legs" after using the recumbent bicycle and "has no muscle tone." (*Id.*) She rated her pain "9/10" before medication and "3/10" after. (*Id.*) Upon physical examination, Dr. Lohuis observed that Claimant's gait and station were normal, she was able to stand on her toes and heels and

on one foot, there was "[n]o pain to palpation of the lumbar spine," and a straight-leg-raising test was "negative bilaterally." (*Id.* at 513.) Dr. Lohuis again encouraged Claimant to continue using the recumbent bicycle and noted, "She will not hurt herself unless she lifts more than 20lb." (*Id.* at 515.)

At her follow-up appointment with her pain specialist on May 31, 2017, Claimant reported "that she has had at least 60-70% relief of her axial back pain since the injection" and "her pain is still minimal now." (*Id.* at 462.) Although Claimant stated that she experienced "some leg weakness which she has been trying to work on with a recumbant [sic] bicycle," she represented that "[s]he is otherwise doing well." (*Id.*) She rated her pain "a 4-5 on a scale of 1-10" and requested another injection "about a month from now." (*Id.*) Upon physical examination, the pain specialist observed that Claimant "moves extremities without difficulty" and "ambulates with a non-antalgic gait." (*Id.* at 463.) She had decreased range of motion in extension of her lower back but full strength in her lower extremities. (*Id.*) She was positive for facet loading bilaterally "but only slightly." (*Id.*) The pain specialist scheduled an injection "in about 30 days." (*Id.*)

Claimant returned to Dr. Lohuis on June 22, 2017, and related that "[s]he over did things at the Smoky mountains [sic] last week" and "is hurting everywhere." (*Id.* at 498.) She described a "Dull aching" pain in her low back and right leg that awakened her during the night and was "Worse with standing and sitting" but "Laying makes it better." (*Id.*) She rated her pain as "8/10" before medication and "3-4/10" after. (*Id.*) She stated that "[s]he is not doing any cooking now" and was "[r]ecently unable to do some housework." (*Id.*) Upon physical examination, Dr. Lohuis observed that Claimant's gait and station were "Antalgic and careful" but she was "[a]ble to stand on toes and heels" and "[a]ble to stand on one foot." (*Id.* at 504.) Dr. Lohuis noted "[n]o pain to palpation" of Claimant's

lumbar spine, but a straight-leg-raising test was "slightly positive bilaterally." (*Id.*) She remarked that Claimant "is suffering today" and "will have an injection next week and hopefully [it will] help." (*Id.* at 505.) She instructed Claimant to exercise "As she can." (*Id.*)

On July 27, 2017, Claimant presented to Dr. Lohuis and complained of headaches, for which Dr. Lohuis prescribed amoxicillin. (*Id.* at 488.) She also reported that she had received a facet joint injection the previous week, which "helped immensely." (*Id.* at 489.) She rated her pain before medication as "7/10" and "4/10" after. (*Id.*) She stated that she was making flower arrangements and crafting for an upcoming wedding and using the recumbent bicycle for "12 min once daily." (*Id.*) However, she related that "[s]he is not doing any cooking now" and "has trouble walking up and down steps." (*Id.*) She reported that vacuuming "is hard on her" but that she was "keeping the baby Monday and Friday." (*Id.*) Upon physical examination, Dr. Lohuis observed that Claimant's gait and station were normal and she was "[a]ble to get up on toes and heels and able to stand on one foot." (*Id.* at 495.) There was "no pain to palpation" of her lumbar spine, and a straight-leg-raising test was negative bilaterally. (*Id.*) Dr. Lohuis remarked that Claimant "is doing extremely well with current pain management." (*Id.* at 496.)

Claimant next returned to Dr. Lohuis on August 24, 2017, and continued to complain of back pain and "worse" right leg pain. (*Id.* at 470.) She related that "[t]he pain is aching and throbbing and is waking her up at night." (*Id.*) Claimant reported that she had recently "traveled a bit" to see her daughter and was scheduled to have another injection before attending a wedding. (*Id.*) She stated that she was "doing some crafting for the wedding," "keeping the baby" two days per week, and doing laundry, dishes, and a "little vacuuming," but she related that the vacuuming "is hard on her" and her husband

had to carry the laundry downstairs. (*Id.* at 471.) Upon physical examination, Dr. Lohuis observed that Claimant's gait and station were normal and she was "[a]ble to stand on toes and heels" and "stand on one foot." (*Id.* at 476.) She further observed that Claimant had "[n]o pain to palpation of the lower lumbar spine" or "over the SI joints." (*Id.*) A straight-leg-raising test was "negative bilaterally." (*Id.*) Dr. Lohuis noted that Claimant "is stable on the pain meds and is doing her best with exercise and stretching." (*Id.* at 477.)

    2. *Opinion Evidence: Dr. Nancy Lohuis, M.D.*

On February 14, 2017, Dr. Lohuis, Claimant's primary care provider, wrote a letter in which she explained that Claimant had been her patient for many years and had "battled back and leg pain since before 2005." (*Id.* at 544.) Dr. Lohuis summarized Claimant's treatment for her pain, which included physical therapy, medication, surgery, and injections, and noted, "She is now being considered for a spinal cord stimulator as she is no longer a surgical candidate." (*Id.*) Dr. Lohuis commented that Claimant "has been a compliant patient following doctor's orders" and "has aggressively sought resolution to her pain and problems appropriately." (*Id.*) She remarked that Claimant "attempted to continue employment during her treatment but in doing so, has missed multiple days per month secondary to her pain and her multiple appointments for evaluation and treatment." (*Id.*) Dr. Lohuis also stated that Claimant "has to lie down multiple times per day due to increase in pain with activity" and "has to take breaks from sitting, standing or lying frequently and unpredictably several times per day." (*Id.*) She concluded, "Unfortunately [Claimant] has been unable to sustain gainful employment due to the relentless back and leg pain." (*Id.*) Dr. Lohuis further explained, "While I am unable to do a full functional capacity evaluation at my office with exact weight

14

measurements, my findings on physical exam are consistent with [Claimant's] underlying diagnosis." (*Id.*)  Dr. Lohuis wrote a nearly identical letter on October 30, 2018, except she noted that Claimant "has put insertion of the spinal cord stimulator on hold." (*Id.* at 622.)

## C. Sequential Evaluation Process

An individual unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months" is considered to be disabled and thus eligible for benefits.  42 U.S.C. § 423(d)(1)(A). The Social Security Administration has established a five-step sequential evaluation process to aid in this determination.  20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *Lewis v. Berryhill*, 858 F.3d 858, 861 (4th Cir. 2017).  The ALJ proceeds through each step until making a finding of either "disabled" or "not disabled"; if no finding is made, the analysis advances to the next step.  20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).  "The ultimate burden to prove disability lies on the claimant." *Preston v. Heckler*, 769 F.2d 988, 990 n.* (4th Cir. 1985); *see Bird v. Comm'r of Soc. Sec.*, 699 F.3d 337, 340 (4th Cir. 2012) ("To establish eligibility for . . . benefits, a claimant must show that he became disabled before his [date last insured].").

At the first step in the sequential evaluation process, the ALJ determines whether the claimant is engaged in "substantial gainful activity."  20 C.F.R. §§ 404.1520(a)(4)(i), 416.920(a)(4)(i).  If the claimant is not engaged in substantial gainful activity, the ALJ moves on to the second step.

At the second step, the ALJ considers the combined severity of the claimant's medically determinable physical and mental impairments.  *Id.* §§ 404.1520(a)(4)(ii),

15

416.920(a)(4)(ii).  The ALJ gleans this information from the available medical evidence. *See Mastro v. Apfel*, 270 F.3d 171, 177 (4th Cir. 2001).  An individual impairment or combination of impairments that is not classified as "severe" and does not satisfy the durational requirements will result in a finding of "not disabled."  20 C.F.R. §§ 404.1520(a)(4)(ii), 416.920(a)(4)(ii); *Mascio v. Colvin*, 780 F.3d 632, 634–35 (4th Cir. 2015).

Similarly, at the third step, the ALJ determines whether the claimant's impairment or combination of impairments meets or is medically equal to the criteria of an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  *See* 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii).  "A claimant is entitled to a conclusive presumption that he is impaired if he can show that his condition 'meets or equals the listed impairments.'" *Radford v. Colvin*, 734 F.3d 288, 291 (4th Cir. 2013) (quoting *Bowen v. City of New York*, 476 U.S. 467, 471 (1986)).

"If the first three steps do not lead to a conclusive determination, the ALJ then assesses the claimant's residual functional capacity" ("RFC") before proceeding to the fourth step.  *Mascio*, 780 F.3d at 635; *see* 20 C.F.R. §§ 404.1520(e), 416.920(e).  The claimant's RFC reflects "her ability to perform work despite her limitations." *Patterson v. Comm'r of Soc. Sec.*, 846 F.3d 656, 659 (4th Cir. 2017); *Monroe v. Colvin*, 826 F.3d 176, 179 (4th Cir. 2016) (defining claimant's RFC as "the most the claimant can still do despite physical and mental limitations that affect his ability to work" (alterations and internal quotation marks omitted)); *see* 20 C.F.R. §§ 404.1545(a)(1), 416.945(a)(1).  The ALJ "first identif[ies] the individual's functional limitations or restrictions and assess[es] his or her work-related abilities on a function-by-function basis," then "define[s] the claimant's RFC in terms of the exertional levels of work." *Lewis*, 858 F.3d at 862.  "In

16

determining a claimant's RFC, the ALJ must consider all of the claimant's medically determinable impairments . . . including those not labeled severe" as well as "all the claimant's symptoms, including pain, and the extent to which his symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence." *Monroe*, 826 F.3d at 179 (alterations and internal quotation marks omitted); *see* 20 C.F.R. §§ 404.1545(a), 416.945(a).

When the claimant alleges a mental impairment, the first three steps of the sequential evaluation process and the RFC assessment are conducted using a "special technique" to "evaluate the severity of [the] mental impairment[]."  20 C.F.R. §§ 404.1520a(a), 416.920a(a); *see Patterson*, 846 F.3d at 659.  Considering the claimant's "pertinent symptoms, signs, and laboratory findings," the ALJ determines whether the claimant has "a medically determinable mental impairment(s)" and "rate[s] the degree of functional limitation resulting from the impairment(s)" according to certain criteria.  20 C.F.R. §§ 404.1520a(b), 416.920a(b); *see id.* §§ 404.1520a(c), 416.920a(c).  "Next, the ALJ must determine if the mental impairment is severe, and if so, whether it qualifies as a listed impairment."  *Patterson*, 846 F.3d at 659; *see* 20 C.F.R. §§ 404.1520a(d), 416.920a(d).  "If the mental impairment is severe but is not a listed impairment, the ALJ must assess the claimant's RFC in light of how the impairment constrains the claimant's work abilities."  *Patterson*, 846 F.3d at 659.

After assessing the claimant's RFC, the ALJ at the fourth step determines whether the claimant has the RFC to perform the requirements of her past relevant work.  20 C.F.R. §§ 404.1520(a)(4)(iv), 416.920(a)(4)(iv); *Monroe*, 826 F.3d at 180.  If she does not, then "the ALJ proceeds to step five." *Lewis*, 858 F.3d at 862.

The fifth and final step requires the ALJ to consider the claimant's RFC, age, education, and work experience in order to determine whether she can make an adjustment to other work.  20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).  At this point, "the burden shifts to the Commissioner to prove, by a preponderance of the evidence, that the claimant can perform other work that 'exists in significant numbers in the national economy.'"  *Lewis*, 858 F.3d at 862 (quoting *Mascio*, 780 F.3d at 635).  "The Commissioner typically offers this evidence through the testimony of a vocational expert [("VE")] responding to a hypothetical that incorporates the claimant's limitations."  *Id.* (quoting *Mascio*, 780 F.3d at 635).  If the claimant can perform other work, the ALJ will find her "not disabled."  20 C.F.R. §§ 404.1520(a)(4)(v), 416.920(a)(4)(v).  If she cannot perform other work, the ALJ will find her "disabled."  *Id.*

Applying the sequential evaluation process in this case, the ALJ concluded that Claimant satisfied the insured status requirements and was insured through the date of the decision.  (Tr. at 12.)  She further determined that Claimant had not engaged in substantial gainful activity since the alleged onset of her disability.  (*Id.*)  She found that Claimant's degenerative disc disease of the lumbar spine, with two prior surgeries, arthritis, and migraine headaches constituted "severe" impairments.  (*Id.*)  However, she found that those impairments, or a combination thereof, failed to meet or medically equal any of the impairments listed in 20 C.F.R. Part 404, Subpart P, Appendix 1.  (*Id.* at 14–15.)  Upon assessing Claimant's RFC, the ALJ determined that Claimant is able "to perform light work . . . except she can never climb ladders, ropes, or scaffolds, but can occasionally climb ramps and stairs, balance, stoop, kneel, crouch, and crawl."  (*Id.* at 15.)

In addition, the ALJ found that Claimant "should avoid frequent exposure to extreme cold, wetness, vibration, and hazards such as moving machinery and unprotected heights." (*Id*.)

The ALJ concluded that given the limitations imposed by the Claimant's RFC, she was able to perform her past relevant work as a hairstylist and a teacher's aide as actually and generally performed. (*Id*. at 19–20.) As a result, the ALJ concluded that Claimant was not "under a disability . . . from November 23, 2015, through the date of this decision." (*Id*. at 20.)

## II.   *LEGAL STANDARD*

This Court has a narrow role in reviewing the Commissioner's final decision to deny benefits: it "must uphold the factual findings of the [ALJ] if they are supported by substantial evidence and were reached through application of the correct legal standard." *Hancock v. Astrue*, 667 F.3d 470, 472 (4th Cir. 2012) (quoting *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005) (per curiam)). "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion," and it must be "more than a mere scintilla." *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019). In other words, this Court "looks to [the] administrative record and asks whether it contains 'sufficient evidence' to support the agency's factual determinations." *Id*. (alteration omitted). "[T]he threshold for such evidentiary sufficiency is not high." *Id*. "In reviewing for substantial evidence, [this Court] do[es] not undertake to reweigh conflicting evidence, make credibility determinations, or substitute [its] judgment for that of the [ALJ]." *Johnson*, 434 F.3d at 653 (quoting *Craig v. Chater*, 76 F.3d 585, 589 (4th Cir. 1996)). Even if "reasonable minds [could] differ as to whether a claimant is disabled,"

this Court upholds the ALJ's decision if it is supported by substantial evidence. *Id.* (quoting *Craig*, 76 F.3d at 589).

### III.   ANALYSIS

Claimant argues that the ALJ erred by not including the absenteeism caused by her frequent medical appointments and her need to lie down during the day for pain relief in her hypothetical questions to the VE. (ECF No. 8 at 4–7.) She further argues that the ALJ improperly evaluated her subjective complaints about her symptoms and based her conclusions on misrepresentations of the record evidence. (*Id.* at 7–15.)[2] Relatedly, Claimant contends that the ALJ's review of the medical evidence omitted or misrepresented her treating physicians' findings. (*Id.* at 16–20.) Lastly, she argues that the ALJ erred by assigning no weight to the opinions of her primary care physician, Dr. Lohuis, and great weight to the opinions of the state-agency medical consultants. (*Id.* at 20–24.) Claimant asks this Court to reverse the Commissioner's decision and award her benefits. (*Id.* at 26.) The Commissioner responds that the ALJ's RFC assessment is supported by substantial evidence and that the ALJ properly evaluated the opinions of Dr. Lohuis and the state-agency medical consultants. (ECF No. 11 at 10–20.) He also argues that the ALJ's hypothetical questions to the VE fully presented Claimant's credibly established functional limitations. (*Id.* at 20–21.)

#### A. VE Hypotheticals

Claimant first argues that the hypothetical questions the ALJ posed to the VE should have accounted for the absenteeism resulting from her frequent medical

---

[2] The heading for this argument asserts that the ALJ failed to conduct a function-by-function analysis when performing the RFC assessment. (ECF No. 8 at 7.) However, the points in the brief relate only to the ALJ's treatment of Claimant's subjective complaints. (*Id.* at 7–15.) As such, that is the argument the undersigned will address.

appointments and her need to lie down during the day. (ECF No. 8 at 4–7.) In determining whether a claimant can perform her past relevant work or adjust to other work at steps four and five of the sequential evaluation process, the ALJ may engage a VE to "offer expert opinion testimony in response to a hypothetical question about whether a person with the physical and mental limitations imposed by the claimant's medical impairment(s)" can perform certain work. 20 C.F.R. §§ 404.1560(b)(2), 416.960(b)(2); *see id.* §§ 404.1560(c), 416.960(c). "In order for a [VE's] opinion to be relevant or helpful, it must be based upon a consideration of all other evidence in the record, and it must be in response to proper hypothetical questions which fairly set out all of [the] claimant's impairments." *Hines v. Barnhart*, 453 F.3d 559, 566 (4th Cir. 2006) (quoting *Walker v. Bowen*, 889 F.2d 47, 50 (4th Cir. 1989)). But the ALJ's hypothetical questions "need only incorporate those limitations which are credibly established in the record." *Manley v. Berryhill*, No. 2:17-cv-02293, 2018 WL 3423821, at *3 (S.D.W. Va. July 16, 2018) (citing *Walker*, 889 F.2d at 50). "[A] hypothetical question is unimpeachable if it adequately reflects a [RFC] for which the ALJ had sufficient evidence." *Fisher v. Barnhart*, 181 F. App'x 359, 364 (4th Cir. 2006) (citing *Johnson v. Barnhart*, 434 F.3d 650, 659 (4th Cir. 2005) (per curiam)) (emphasis deleted) (internal quotation marks omitted).

Although she does not discuss them in the portion of her brief dedicated to this issue, Claimant's contentions that she would miss work frequently due to her medical appointments and that she would need to lie down during the day appear to stem principally from two practically identical letters that her primary care physician, Dr. Lohuis, wrote on February 14, 2017, and October 30, 2018. (Tr. at 544, 622.) Specifically, Dr. Lohuis remarked, "[Claimant] attempted to continue employment during her treatment but in doing so, has missed multiple days per month secondary to her pain and

her multiple appointments for evaluation and treatment.  She has to lie down multiple times per day due to increase in pain with activity." (*Id.*)  The ALJ explained that she rejected Dr. Lohuis's opinions because they "are very general and include[] very little explanation of the evidence relied on in forming the opinion, such as examination findings (which are not documented in the letter)." (*Id.* at 19.)  The ALJ may permissibly discount a treating physician's opinion when the basis for it is not articulated.  *See Slowik v. Comm'r of Soc. Sec.*, No. BPG-11-cv-1698, 2012 WL 3610774, at *2 (D. Md. Aug. 21, 2012); *see also Craig v. Chater*, 76 F.3d 585, 590 (4th Cir. 1996) (holding that ALJ properly rejected "conclusory" opinion).[3]  Elsewhere in her decision, when evaluating Claimant's subjective complaints,[4] the ALJ noted that Claimant's treating providers' objective examination findings were largely normal; she was able to perform some household chores, exercise, care for her toddler grandson, and travel; and her "treatment has been generally successful in controlling [her] symptoms," leading the ALJ to conclude that Claimant is not as limited as she alleged. (Tr. at 17–18.)  Put simply, the ALJ's written decision reflects her reasons for not including the restrictions Claimant identifies in her hypotheticals to the VE.

Moreover, with regard to her assertion that she would miss work frequently for medical appointments, Claimant points to her monthly visits to her primary care physician and her specialists, in addition to her physical therapy. (ECF No. 8 at 5–6.)  But a claimant's "regularly scheduled appointments for maintenance of her chronic conditions," as opposed to unforeseen emergency treatment, can generally "be planned to accommodate her work schedule" and would not inherently result in excessive

---

[3] A more complete discussion of the weight the ALJ accorded to the opinion evidence in the record appears *infra*.

[4] A more complete discussion of the ALJ's treatment of Claimant's subjective complaints appears *infra*.

absenteeism precluding gainful employment.  *Bailey v. Berryhill*, No. 3:17-cv-01365, 2018 WL 2091358, at \*23 (S.D.W. Va. Apr. 10, 2018); *see Clay v. Berryhill*, No. 2:18-cv-00260, 2018 WL 4782273, at \*7–\*8 (S.D.W. Va. July 2, 2018), *adopted by* 2018 WL 4781188 (S.D.W. Va. Oct. 3, 2018).

Claimant further contends that her need to lie down during the day "is addressed throughout the record."  (ECF No. 8 at 6.)  But with the exception of Dr. Lohuis's opinions, each reference to this restriction is derived from Claimant's own statements and self-reported symptoms.  The fact that Claimant's treating physicians summarized her subjective complaints in their treatment records does not transform those statements into objective findings.  *Craig*, 76 F.3d at 590 n.2.  And the ALJ is not required to accept those subjective complaints at face value.  *Vanhoose v. Saul*, No. 3:19-cv-00679, 2020 WL 4044326, at \*10 (S.D.W. Va. July 2, 2020), *adopted by* 2020 WL 4042902 (S.D.W. Va. July 17, 2020).  As the undersigned has already explained, in discounting Dr. Lohuis's opinions and Claimant's subjective complaints, the ALJ made clear why the record did not warrant a restriction that Claimant lie down during the day.  (Tr. at 16–19.)

In sum, the undersigned **FINDS** that the ALJ did not err by failing to present hypotheticals to the VE that accounted for the absenteeism resulting from Claimant's frequent medical appointments and her need to lie down during the day.

### B. Subjective Complaints

Claimant next argues that the ALJ insufficiently explained her reasons for discounting Claimant's subjective complaints.  (ECF No. 8 at 7–15.)  As part of the RFC assessment, the ALJ must evaluate a claimant's "statements and symptoms regarding the limitations caused by her impairments."  *Linares v. Colvin*, No. 5:14-cv-00120, 2015 WL 4389533, at \*5 (W.D.N.C. July 17, 2015) (citing 20 C.F.R. §§ 404.1529, 416.929; *Craig v.*

*Chater*, 76 F.3d 585, 593–96 (4th Cir. 1996)).  To evaluate the disabling effect of an individual's symptoms, the ALJ first determines whether "objective medical evidence" supports the existence of "a condition reasonably likely to cause the [symptoms] claimed." *Hines v. Barnhart*, 453 F.3d 559, 565 (4th Cir. 2006); *see* 20 C.F.R. §§ 404.1529(c)(1), 416.929(c)(1).  If so, the ALJ then "evaluate[s] the intensity and persistence of [the claimant's] symptoms" to "determine how [those] symptoms limit [the claimant's] capacity for work." 20 C.F.R. §§ 404.1529(c)(1), 416.929(c)(1).  An individual's subjective complaints about her symptoms are relevant to the latter determination.  *See id.* §§ 404.1529(c)(3), 416.929(c)(3).  Put simply, the claimant's symptoms "must be supported by objective medical evidence showing the existence of a medical impairment which could reasonably be expected to produce the [symptoms], in the amount and degree, alleged by the claimant." *Johnson*, 434 F.3d at 657 (quoting *Craig*, 76 F.3d at 591).  The ALJ is obligated to "assess whether the claimant's subjective symptom statements are consistent with the record as a whole." *Vass v. Berryhill*, No. 7:17-cv-87, 2018 WL 4737236, at *6 n.4 (W.D. Va. June 12, 2018), *adopted by* 2018 WL 4704058 (W.D. Va. Sept. 30, 2018).

The ALJ in this case began her RFC assessment by meticulously recounting Claimant's hearing testimony, including—as relevant here—Claimant's statements that she has "difficulty walking, standing, and sitting for extended periods of time due to low back and leg pain," that she performs household chores with assistance from her husband and daughter, that she exercises with a recumbent bicycle and stretches, that she has traveled occasionally but "stayed in the hotel some of the time" during a family vacation to Disney World, and that she used to babysit her two-year-old grandson on Mondays and Fridays "but now she only keeps him on Friday when her husband is home to assist with

24

his care." (Tr. at 16–17.)  The ALJ acknowledged that Claimant's "medically determinable impairments could reasonably be expected to cause the alleged symptoms," but she determined that Claimant's "statements concerning the intensity, persistence, and limiting effects of these symptoms are not entirely consistent with the medical evidence and other evidence in the record for the reasons explained in this decision."  (*Id*. at 17.)

She went on to note that objective imaging showed that Claimant suffered from "facet arthropathy of the lumbar spine and lumbar stenosis with degenerative changes at L4/5" and that Claimant had two back surgeries in April 2005 and February 2016 and received pain management treatment, "includ[ing] injections, radiofrequency ablation, and medications," in addition to post-surgical physical therapy in 2016.  (*Id*.)  The ALJ then summarized Claimant's treating providers' objective examination findings, which "show steady gait, normal range of motion, except on flexion, negative straight leg raising, bilaterally, and normal muscle strength and reflexes" and that Claimant "was neurologically stable."  (*Id*. (internal citations omitted).)  These findings led the ALJ to conclude, "Overall, the degree of limitations alleged by the claimant are [sic] inconsistent with the evidence of record."  (*Id*. at 18.)

Next, the ALJ reviewed Claimant's daily activities, noting that Claimant reported performing household chores such as "sweeping, taking out trash, washing dishes, loading the dishwasher, doing laundry, taking care of personal hygiene, and dusting," and exercising, including walking, using an elliptical machine and recumbent bicycle, and doing yoga.  (*Id*.)  She further noted that Claimant reported babysitting her grandson on Mondays and Fridays, crocheting, coloring, arranging flowers and crafts for her daughter's wedding, and "attend[ing] meetings with her husband while he was running

for judge." (*Id.*)[5]  The ALJ reasoned that these daily activities "are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations." (*Id.*)  She contrasted Claimant's testimony that "she only watches her . . . grandson on Fridays, when her husband is off work and can assist [her]" with her statements elsewhere in the record that she babysat twice per week "with no mention of assistance from her husband." (*Id.*)  She also referenced Claimant's "alleged limited mobility and difficulty sitting for prolonged periods" and found it "inconsistent" with her several trips and vacations. (*Id.*)

Lastly, the ALJ noted that Claimant "cancelled or failed to show up for physical therapy appointments on a number of occasions" and that her other prescribed treatment "has been generally successful in controlling [her] symptoms" based on Claimant's statements that surgery, radiofrequency ablation, and injections provided pain relief. (*Id.*)

Despite this analysis, Claimant, citing *Brown v. Commissioner, Social Security Administration*, 873 F.3d 251 (4th Cir. 2017), argues that the ALJ did nothing more than set forth "a laundry list of daily activities" without acknowledging that Claimant "does not perform all, or even most, of these activities daily" and performs them only to a "limited extent." (ECF No. 8 at 9–12 (emphasis in original).)  But unlike the ALJ in *Brown*, who improperly embellished the claimant's daily routine based on sporadic references to certain activities in his treatment records and ignored objective medical evidence of the claimant's limitations, *see* 873 F.3d at 263–65, the ALJ in this case provided a lengthy

---

[5] Claimant, based on her hearing testimony, asserts that she "specifically denied" doing yoga, using an elliptical, and crocheting, and the ALJ's assertion otherwise is "inaccurate." (ECF No. 8 at 15.)  But there is record evidence, which the ALJ cites, that Claimant reported doing these activities. (*See, e.g.*, Tr. at 398, 489; *see also id.* at 525, 572.)

summary of Claimant's hearing testimony, including her statements that she needed a wheelchair to shop at the mall, had fallen twice, could "perform a few household chores" but needed assistance from her husband and daughter with laundry and shopping, was unable to clean her house for a family gathering, "stayed in the hotel some of the time" during a family vacation to Disney World, and could only babysit her toddler grandson "on Friday when her husband is home to assist with his care" (Tr. at 16). The ALJ later compared these statements to Claimant's daily activities as she reported them to her treating physicians and concluded that her "daily activities[] are not limited to the extent one would expect, given the complaints of disabling symptoms and limitations." (Tr. at 18.) Contrary to Claimant's suggestion, the ALJ is not required to accept a claimant's hearing testimony wholesale. *Berry v. Saul*, No. 3:19-cv-00259, 2020 WL 1868769, at *11 (S.D.W. Va. Mar. 30, 2020), *adopted by* 2020 WL 1865849 (S.D.W. Va. Apr. 14, 2020). Here, she credited Claimant's statements about her daily activities to her treating physicians and found that the "variety" of things Claimant was able to do, even in the limited manner she described, did not support her allegations of disabling pain. (Tr. at 18.)

Claimant also takes issue with the way the ALJ treated her subjective statements about caring for her grandson and traveling. (ECF No. 8 at 12–14.) With regard to babysitting, she argues that she "tried and failed" to care for her grandson without assistance, and the ALJ's assertion otherwise is "mistaken." (*Id*. at 12–13.) But as the ALJ stated, the record indeed "shows the claimant would keep her grandson on Monday and Friday, with no mention of assistance from her husband." (Tr. at 18.) In the treatment records cited by the ALJ, Claimant reported to her primary care physician, Dr. Lohuis, that she was babysitting on Mondays and Fridays and did not relate that she

needed her husband's assistance to do so.  (*Id.* at 471, 489, 516.)  In fact, she remarked that it "has gone well."  (*Id.* at 516.)  The ALJ was under no obligation to disregard this evidence simply because Claimant testified differently at the hearing.  *See Bryant v. Colvin*, 571 F. App'x 186, 190 (4th Cir. 2014) (per curiam) ("It is the ALJ's responsibility to find the facts and weigh the evidence.").

And as to traveling, Claimant asserts that she did not do so without difficulty and suffered increased symptoms as a result.  (ECF No. 8 at 13–14.)  Essentially, however, the ALJ found that Claimant's ability to travel in the first place was "inconsistent" with her allegations of "limited mobility and difficulty sitting for prolonged periods."  (Tr. at 18.)[6] This is a permissible reason to discount a claimant's subjective complaints.  *See Rexrode v. Astrue*, No. 2:09-cv-00153, 2010 WL 1253733, at *14 (S.D.W. Va. Mar. 29, 2010) ("Although a vacation and disability are not mutually exclusive, the claimant's decision to go on vacation tends to suggest that the alleged symptoms and limitations may have been overstated.").

Finally, Claimant argues that the ALJ misrepresented the record evidence when she stated that Claimant's "treatment has been generally successful in controlling [her] symptoms."  (ECF No. 8 at 14; Tr. at 18.)  She contends that her pain management has provided "largely temporary relief" and that she suffers from "ongoing, continued pain in the back and lower extremity."  (ECF No. 8 at 14.)  But the ALJ never states that Claimant's pain was entirely relieved with treatment, only that she "reported decreased pain after ablation" and "60 to more than 80 percent pain relief with injections."  (Tr. at 18.)  The

---

[6] For this reason, the ALJ's misstatement of fact that Claimant drove to Disney World instead of flying (Tr. at 16) is inconsequential.  *See Hensley v. Saul*, No. 3:19-cv-00845, 2020 WL 5351655, at *7 (S.D.W. Va. Aug. 18, 2020) (suggesting that ALJ's misstatement of fact must result in prejudice to claimant), *adopted by* 2020 WL 5350292 (S.D.W. Va. Sept. 4, 2020).

ALJ also cites recent treatment records from Claimant's primary care physician, Dr. Lohuis, noting that Claimant "is doing extremely well with current pain management" and her pain specialist indicating that Claimant "has done well with the injections." (Tr. at 17, 463, 496.) It is therefore unclear how the ALJ's statement that her treatment controlled her symptoms inaccurately reflected the medical evidence of record. She was entitled to discount Claimant's subjective complaints on the basis that treatment relieved her pain. *See Glenn v. Shalala*, 23 F.3d 400 (4th Cir. 1994) (per curiam) (table), 1994 WL 199759, at *2 (citing *Gross v. Heckler*, 785 F.2d 1163, 1166 (4th Cir. 1986) (per curiam)). Notably, "disability requires more than mere inability to work without pain." *Clemens v. Astrue*, No. 3:11-cv-599-MOC-DSC, 2012 WL 1698293, at *4 (W.D.N.C. Apr. 24, 2012) (quoting *Ferrante v. Bowen*, 869 F.2d 593 (4th Cir. 1989) (per curiam) (table), 1989 WL 14408, at 4).

Put simply, the ALJ explained her reasons for concluding that Claimant was not as limited as she claims and cited to medical evidence of record to support that conclusion. (Tr. at 16–18.) "If the ALJ points to substantial evidence in support of his decision and adequately explains the reasons for his finding on the claimant's credibility, the court must uphold the ALJ's determination." *Brown v. Astrue*, No. 8:11-cv-03151-RBH-JDA, 2013 WL 625599, at *17 (D.S.C. Jan. 31, 2013), *adopted by* 2013 WL 625581 (D.S.C. Feb. 20, 2013). Claimant essentially asks this Court to assess the evidence anew and weigh it in her favor, which this Court cannot do. *Johnson*, 434 F.3d at 653 ("In reviewing for substantial evidence, we do not undertake to reweigh conflicting evidence, make credibility determinations, or substitute our judgment for that of the [ALJ]." (quoting *Craig*, 76 F.3d at 589)). Accordingly, the undersigned **FINDS** that the ALJ sufficiently evaluated Claimant's subjective complaints in this case.

*C. Review of Medical Evidence*

In an argument that is effectively an extension of her assertions that the ALJ improperly evaluated her subjective complaints and Dr. Lohuis's opinions, Claimant contends that the ALJ's review of the medical evidence as part of her RFC assessment insufficiently describes her treatment records.  (ECF No. 8 at 16–20.)  The RFC assessment must indeed be "based on all of the relevant medical and other evidence."  20 C.F.R.  §§ 404.1545(a)(3), 416.945(a)(3).   Therefore, it must "[c]ontain a thorough discussion and analysis of the objective medical and other evidence."  SSR 96-8p, 1996 WL 374184, at \*7 (July 2, 1996).  But "there is no rigid requirement that the ALJ specifically refer to every piece of evidence in his decision."  *Reid v. Comm'r of Soc. Sec.*, 769 F.3d 861, 865 (4th Cir. 2014) (citing *Dyer v. Barnhart*, 395 F.3d 1206, 1211 (11th Cir. 2005) (per curiam)).  Claimant's argument that the ALJ was obligated to extensively discuss—or even reference in passing—each of her treatment records is thus plainly without merit.  The ALJ highlighted Claimant's medical treatment during the relevant period with appropriate citations to the record.  (Tr. at 17–18.)  It is clear that she considered Claimant's treatment records from appointments with her neurosurgeon and her pain specialist, even if she only cited to them and did not reference the physicians by name.  (*Id.*)  Nothing more was required.  *See Reid*, 769 F.3d at 865 (determining that ALJ properly considered record where he "specifically referenced [claimant's] 'history of thoracic and lumbar fusion,' noting that 'treatment notes from the relevant period document that the claimant was responding well to treatment with minimal complaints'").

Moreover, Claimant attempts to equate her self-reported symptoms, as they were recorded by her treating providers in her treatment records, with objective findings about her functional abilities. (ECF No. 8 at 16–20.) As the undersigned has already stated, however, a physician's documentation of his patient's statements is not "objective clinical medical evidence." *Craig*, 76 F.3d at 590 n.2. In this case, the ALJ properly considered such statements as part of her evaluation of Claimant's subjective complaints. (*See* Tr. at 18.) Ultimately, the ALJ determined that they were not fully credible. (*Id.* at 16–18.) The undersigned has addressed this at length above and will not repeat the discussion here. At bottom, the undersigned **FINDS** that the ALJ made no error in her review of the medical evidence of record.

### D. Opinion Evidence

Lastly, Claimant argues that the ALJ erroneously gave no weight to the opinions of her primary care physician, Dr. Lohuis. (ECF No. 8 at 20–24.) When determining whether a claimant is disabled, the ALJ must "evaluate and weigh medical opinions" by considering, among other factors, "(1) whether the physician has examined the applicant, (2) the treatment relationship between the physician and the applicant, (3) the supportability of the physician's opinion, (4) the consistency of the opinion with the record, and (5) whether the physician is a specialist." *Johnson*, 434 F.3d at 654. A treating physician's opinion about a claimant's condition may be given "greater weight" than that of a non-treating physician "because the treating physician has necessarily examined the applicant and has a treatment relationship with the applicant." *Id.* "[A] treating physician's opinion on the nature and severity of the claimed impairment is entitled to controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial

evidence in the record." *Mastro v. Apfel*, 270 F.3d 171, 178 (4th Cir. 2001). "[T]he ALJ holds the discretion to give less weight to the testimony of a treating physician in the face of persuasive contrary evidence." *Id.*

The ALJ in this case first addressed Dr. Lohuis's opinions that Claimant "has to lie down multiple times per day due to increased pain with activities," "has to take breaks from sitting, standing, or lying frequently and unpredictably several times a day," and "is unable to sustain gainful employment due to relentless back and leg pain." (Tr. at 19.) She determined that "the opinions are very general and include[] very little explanation of the evidence relied on in forming the opinion, such as examination findings (which are not documented in the letter)." (*Id.*) As a result, she accorded "no weight" to them. (*Id.*) The undersigned has already stated that the ALJ has the discretion to give less weight to a medical opinion that is insufficiently explained, even if it comes from a treating physician. *See Slowik*, 2012 WL 3610774, at *2. "Supportability" is a key factor the ALJ considers when weighing medical opinions, and generally, "[t]he more a medical source presents relevant evidence to support a medical opinion" and "[t]he better an explanation a source provides . . . the more weight [the ALJ] will give that medical opinion." 20 C.F.R. §§ 404.1527(c)(3), 416.927(c)(3). Claimant's assertions that the ALJ's rejection of Dr. Lohuis's opinions on this basis "is erroneous" and "violates the directions set forth in *20 C.F.R. §416.927*" are thus clearly meritless. (ECF No. 8 at 22 (emphasis in original).)

Still, Claimant avers that Dr. Lohuis's opinions are verified by her treatment records, which "provide significant detail as to symptoms, functional status, diagnostic testing, medication, other medical care, and the like." (*Id.* at 22–23.) Dr. Lohuis remarks in her letters that her "findings on physical exam are consistent with [Claimant's] underlying diagnosis." (Tr. at 544, 622.) But the ALJ's review of the medical evidence of

record reveals that those examination findings were in large part normal. (*Id.* at 17.) Thus, the restrictions in Dr. Lohuis's letters appear to derive from Claimant's own statements to Dr. Lohuis, not from her objective findings. (*See* ECF No. 8 at 23.) But in addition to telling Dr. Lohuis that she needed to lie down and could not stay in one position for lengthy periods, Claimant also reported that she remained able to perform some household chores, albeit with assistance, care for her toddler grandson, exercise, and travel for vacations and other trips. (*See, e.g.*, Tr. at 471, 489, 498, 508, 516, 525–26, 535, 545, 548, 551, 554, 560, 569, 572.) The ALJ weighed this evidence and concluded that the objective findings, the activities Claimant reported to her treating providers that she was able to do, and the pain relief provided by her treatment indicated that Claimant was not as limited as she claimed to be—or as Dr. Lohuis opined her to be. (*Id.* at 17–18.) The undersigned therefore **FINDS** that substantial evidence supports the ALJ's decision to give no weight to Dr. Lohuis's opinions.

Claimant further asserts that the ALJ erroneously accorded "great weight" to the opinions of the state-agency medical consultant at the reconsideration level, who did not examine Claimant and based his opinions on a partial record. (ECF No. 8 at 23–24.) However, "the testimony of a non-examining physician can be relied upon when it is consistent with the record." *Smith v. Schweiker*, 795 F.2d 343, 346 (4th Cir. 1986) (citing *Kyle v. Cohen*, 449 F.2d 489, 492 (4th Cir. 1971)). The ALJ in this case found that the state-agency medical consultant's opinions were "supported by the treatment records, examination findings, and effectiveness of treatment." (Tr. at 19 (internal citations omitted).) In other words, the ALJ determined that those opinions were consistent with the record as it stood before her, even though the state-agency medical consultant did not have the benefit of about six months of medical records that postdated his evaluation of

the claim.[7]  "An ALJ may rely on a medical source opinion that did not have access to the entire medical record, so long as the ALJ considered the entire evidentiary record and substantial evidence supports the ALJ's decision."  *Ledford v. Colvin*, No. 6:14-cv-1164-BHH, 2015 WL 5616290, at *23 (D.S.C. Sept. 24, 2015) (report and recommendation of magistrate judge) (citing *Thacker v. Astrue*, No. 11-246, 2011 WL 7154218, at *6 (W.D.N.C. Nov. 28, 2011)), *adopted by* 2012 WL 380052 (W.D.N.C. Feb. 6, 2012).  That is the case here.  Accordingly, the undersigned **FINDS** that the ALJ did not err by giving "great weight" to the opinions of the state-agency medical consultant at the reconsideration level.

## IV.    CONCLUSION

For the foregoing reasons, the undersigned respectfully **RECOMMENDS** that the presiding District Judge **DENY** Claimant's request to reverse the Commissioner's decision (ECF No. 8), **GRANT** the Commissioner's request to affirm his decision (ECF No. 11), **AFFIRM** the final decision of the Commissioner, and **DISMISS** this action from the Court's docket.

The parties are notified that this Proposed Findings and Recommendation is hereby **FILED** and a copy will be submitted to the Honorable David A. Faber, Senior United States District Judge.  Pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Federal Rule of Civil Procedure 72(b), the parties shall have fourteen (14) days from the date of the filing of this Proposed Findings and Recommendation to file with the Clerk of this Court specific written objections identifying the portions of the Proposed Findings

---

[7] Notably, the state-agency medical consultant reviewed Claimant's function report, pain questionnaire, physical therapy treatment records, treatment records from her neurosurgeon, all but two treatment records from her pain specialist, and almost two years of treatment records from Dr. Lohuis.  (Tr. at 91–93.)  For Claimant to suggest that he did not have a complete picture of her condition despite having access to this evidence is disingenuous.

and Recommendation to which objection is made and the basis of such objection. Extension of this time period may be granted for good cause shown. Copies of any objections shall be served on opposing parties and provided to Judge Faber.

Failure to file written objections as set forth above shall constitute a waiver of *de novo* review by the District Court and a waiver of appellate review by the Fourth Circuit Court of Appeals. 28 U.S.C. § 636(b)(1); *see Thomas v. Arn*, 474 U.S. 140, 155 (1985); *Snyder v. Ridenour*, 889 F.2d 1363, 1366 (4th Cir. 1989); *Wright v. Collins*, 766 F.2d 841, 846 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91, 94 (4th Cir. 1984).

The Clerk is **DIRECTED** to file this Proposed Findings and Recommendation and to transmit a copy of the same to counsel of record.

ENTER: September 25, 2020

Dwane L. Tinsley
United States Magistrate Judge